AtKinsoN, Judge,
delivered the opinion of the court:
This case having been decided on February 12, 1912, is now before us^on plaintiff’s motion for a new trial, and for amendments of findings of fact by both plaintiff and defendants.
This suit was brought to recover from the United States under an implied contract the sum of $1,000,417.56, which is alleged to be the net profits accruing to them from the use of a patented device granted to plaintiff, covering a period of 10 years from April 16, 1900, to June 30, 1910. The defendants deny the validity of the patent, as well as the ex *37 istence of an implied contract in fact lor tbe use of tbe device by tbe Post Office Department.
Tbe most important question presented by tbe findings is tbat of jurisdiction. Tbe circumstances attending a transaction involving tbe manufacture and use of a patented device out of wbicb an implied contract to pay royalties tberefor arises, must indicate mucb more tban mere consent to its use upon tbe part of tbe patentee. Tbe convergence of other .important facts must obtain. It must clearly appear tbat tbe defendants not only used tbe patented device, but at tbe time of user did so witb knowledge of tbe patent and absolutely no claim of ownership or title upon their part in tbe thing used. In other words, tbe invitation to use tbe patented article must be accepted by a user of tbe same witb what amounts to a disclaimer upon tbe part of tbe defendants of title or ownership in tbe invention used, if as in this case tbe defendants positively disclaim having used tbe patented article, and follow this assertion witb a positive claim of invention upon their part, quite distinct from tbe letters-patent granted to tbe claimant, decbning to concede either use or ownership in tbe article used to tbe claimant, tbe elements of mutuality are lacking, and tbe transaction is one of infringement. This case is totally unlike United States v. Palmer, 128 U. S., 262, and United States v. Berdan Fire Arms Co., 156 U. S., 552. In these cases tbe patented article was exhibited to competent boards appointed by tbe proper departments to test as prehminary to user tbe proffered articles; tbe United States not only knew of tbe patented invention, but used tbe same without claim of ownership or title in itself to tbe article used. Kesponsi-bility attached as upon contractual relations, wholly upon tbe idea tbat tbe circumstances of user by tbe defendants disclosed a lack of any claim of ownership or title upon its part in the article used. As was said by tbe Supreme Court in Schillinger v. United States, 155 U. S., 169, “The successive allegations place tbe parties in continued antagonism to each other, and there is no statement tending to show a coming together of minds in respect to anything.” Tbe findings in this case disclose tbat tbe Post Office Department *38 previous to the issuance of stamp books worked out the plans and specifications for the same without actual knowledge and certainly quite independently of the Farnham patent; that before issuing the same through its proper legal officer reviewed said letters-patent and then proceeded in strict disregard of the same to manufacture and sell the same as an invention wholly its own, expressly repudiating the Farnham patent as having any relation thereto.
The Supreme Court in deciding the Berdan case used this language: “While the findings are not so specific and emphatic as to the assent of the Government to the terms of any contract, yet we think they are sufficient. There was certainly no denial of the patentee’s rights to the invention; no assertion on the part of the Government that the patent was wrongfully issued; no claim of a right to use the invention regardless of the patent; no disregard of all claims of the pat-entee, and no use, in spite of protests or remonstrance. Negatively, at least the findings are clear. The Government used the invention with the consent and express permission of the owner, and it did not, while so using it, repudiate the title of such owner,” which clearly differentiates that case from this and at the same time states the rule upon which we predicate the decision of the court in this case. We think the language entirely apposite and that the transaction here involved was one of infringement.
Plaintiff vigorously opposes the findings of the court respecting the prior state of the art, and all other contentions challenging the validity of claimant’s patent, asserting a want of authority upon the part of the defendants to make such a defense. If the case involved an express contract between the parties, plaintiff’s objections would be sound: Harvey Steel Co. v. United States, 38 C. Cls., 662; 196 U. S., 310; United States v. Palmer, 128 U. S., 262. Where, however, the jurisdiction of the court as well as plaintiff’s right to recover depends upon a user of the alleged invention under such circumstances as to warrant an implication of a contract to pay therefor, the rule is quite the opposite, especially so where the defendants deny all the allegations of the petition. The existence of the essential elements out of which an implied contract arises, heretofore set forth, is a subject *39 of disputation, and tbe defendants can not be precluded, simply because the United States is involved, from showing by positive proof, a situation that in itself precludes the idea of mutuality or recognition of plaintiff’s patent on its part. The question raised is not new, it has heretofore been passed upon, and the court has uniformly held it to be without merit. Morse Arms Co. v. United States, 16 C. Cls., 296; Harvey Steel Co. v. United States, 38 C. Cls., 681; Societe Anon. v. United States, 224 U. S., 309; Knapp v. United States, 46 C. Cls., 601; Beach v. United States, 226 U. S., 243.
This court is, of course, without jurisdiction to invalidate a patent; its judgments do not assume to do so. The purpose of the findings objected to, as well as the defense interposed thereunder, is to ascertain just what the plaintiff’s invention really was, the full extent or limitations of his claims and their identity with reference to the article employed by the defendants in their manufacture and sale of stamp books and his property right therein. One of the principal defenses goes specifically to the question of identity. As was said by the court in Harvey Steel Go. v. United States, supra: “In all such cases all defenses were open to the defendants — the Government — -which are open to ordinary defendants in ordinary actions for infringement. They could set up another title, a license under another antecedent patent; they could attack the validity of a patent, and show that the invention which they appropriated was not property; they could maintain that the device which they manufactured differed in essential particulars from the device which the inventor had protected by letters patent: * * * In a word, they could always treat such suits * * * as if they were actions for infringement.”
Bookmaking and bookbinding are very old; no claim of novelty is made by the plaintiff as to any of the elements entering into the stamp book produced by his alleged invention. They are admittedly old. The invention claimed related specifically to a method, a process by which certain specially designed elements combined in a certain way produced a certain result not heretofore produced in that way. The object to be accomplished as gathered from the specifications of the patentee was to produce an inexpensive form *40 of coyer in wbicb stamps were to be secured in book form, and wbicb might be divided into smaller books of sucb size as desirable. To accomplish this result the plaintiff first divided the ordinary stamp sheet used by the Government into certain parts, wbicb be designedly left unprinted for the purpose of stitching and folding. This sheet in turn was to be adapted to a backing covering, especially designed as com-plementa! to the stamp sheet, so that by a process of stitching, folding, and cutting great quantities of the completed book might be produced by a series of single operations. There is some question as to the practicability of the invention, due to the contraction and expansion of the stamp sheet as manufactured by the United States, but aside from this, plaintiff’s letters-patent disclose by his claims that the finished product to be produced by his methods of manufacture created a stamp book made by stitching the component elements together, then folding the cover in such a way as to inclose both front and back of the book, leaving a sufficient margin for the formation of flaps upon the same to secure its closing. This was the invention upon which he secured his letters-patent, as clearly shown from the history of the patent in the Patent Office. This invention the defendants did not use; they never at any time used a stamp sheet designed in accord with plaintiff’s claim therefor; they at no time employed the folding process and attaching their covers, and otherwise omitted, as shown by the findings, at least one margin of unprinted space in the stamp sheet itself. It was held in the case of Singer Mfg. Co. v. Cramer, 192 U. S., 265, "where the patent is not a primary patent and there is no substantial identity in the character of two devices except as the combination produces the same effect, and there are substantial and not merely col-orable differences between them, there is no infringement of the earlier patent.”
Citations are hardly necessary to sustain the oft-repeated doctrine that where the invention claimed is no more than the employment of elements old in the art to accomplish a new purpose or result, the invention is limited specifically to the detail of one’s claims.
The remaining question to be considered is the validity of the patent granted by the United States Patent Office to *41 plaintiff for a postage-stamp bolder, dated January 4, 1898, and numbered 596656. Application for a patent on this device was first filed by plaintiff in the Patent Office March 17, 1896, which application was rejected, and an amended request for the issuance of the same was again filed September 14, 1897. Plaintiff, however, claims that he first discovered the utility of his stamp-holder combination in August, 1894, which claim is attested by two witnesses; but this contention, however, is not material to the issues involved in this suit. The court, in determining the validity of the patent, need only consider the matter of dates in so far as it is necessary to determine the relation of plaintiff’s patent to the prior state of the art when applied to the several similar patented and unpatented devices which are herein involved.
Considering the subject of what an invention is, Walker on Patents, section 23, says:
“Patents are grantable for things invented, and not for things otherwise produced, even where the production required ability of a high order. N°velty and utility must, indeed, characterize the subject of a patent, but they alone are not enough to make anything patentable; for the statute provides that things to be patented must be invented things, as well as new and useful things.”
Hence, to be patentable, an idea or discovery must not only possess novelty and utility but it must be the product of inventive faculties as well.
Claim 1 of plaintiff’s patent reads as follows:
“A stamp sheet having one series of narrow, unprinted spaces in the body thereof, a second series of spaces wider than the first, along which said sheet is adapted to be stitched, a third series of spaces wider than the first and second series extending around the edges and centrally of said sheet, substantially as described;” and he lays particular stress upon this claim of his patent, alleging therein both novelty and invention.
A mass of evidence and many exhibits have been introduced to show that the form of stamp sheet claimed in his patent involved invention, because of the fact that by this method or form it was possible to economically produce large numbers of the stamp booklets by multiple manufac *42 ture. The small margin of profit possible in the sale of stamp books made it essential to the success of the device to manufacture them at a minimum of cost. Plaintiff knew this, and his purpose therefore was to secure a patent on such a design of stamp sheet as would achieve this result. His effort, however, to secure acknowledgment of invention in this particular claim by the Patent Office officials met with many rejections, as is shown by the findings.
Whatever particular novelty there is in claim 1 of the patent consists, after five rejections, in adding a third series of spaces to the form of stamp sheet. In his application plaintiff states that “the flaps on the outside and on the inside of the cover F may be dispensed-with, if desired, in which case the wide space h in the middle of the sheet of stamps and the flap P' need not be provided.”
It is shown by the proceedings before the examiners of the Patent Office that the claim was allowed only after the introduction of the centrally extending spaces, and yet we find plaintiff alleging in his specifications that the same results can be achieved without these spaces as well as with them.
The Patent Office examiners decided that there was no patentable novelty in claim 1 when the stamp sheet had “one series of narrow unprinted spaces in the body thereof * * * and another series of wider unprinted spaces adapted to be cut off.” Plaintiff thereupon added “a third series of spaces wider than the first and second series extending around the edges and centrally of said sheet”; but in his specifications he states that in the manufacture of his device the wide central space h shown in his sheet of stamps (printed in Finding II) need not be provided. If the third space in his stamp sheet is not essential, then he reverts back to his claim as amended July 18, 1896, as to which the examiner said it “is thought to relate to nothing of patentable novelty differing from the ordinary structure of stamp sheets with their blank margins only in a matter of degree.”
Having failed to get claim 1 of his application through the Patent Office on his claim of a stamp sheet without the third series of spaces, and when the examiners stated in their rejection of this particular claim that “applicant’s claim can only be read when including the blank margins of the ordinary *43 stamp sheet,” therefore plaintiff, in order to secure a different construction from that of the ordinary known prior art, added “a third series of spaces,” but renounces it as necessary or advantageous in the development of his device.
His Exhibit No. 21 printed in Finding II does not show the use of this central wide space because he had voluntarily dispensed with it. It is therefore plainly to be seen that the claim of a third space in the stamp sheet was one of expediency, alleged for the purpose of securing the allowance of claim 1 of his application for a patent, which reveals the fact that his allowed patent for a stamp-book holder was more the result of evolution than invention.
As we have already shown, a device to be patentable must not only possess novelty and utility, but it must also be the product of the inventive faculties. It must not merely show skill but must evince invention. If, however, the mind advances from the known to the unknown by a transition natural to the ordinary instructed intellect, there is no invention. Reasoning is not invention. Merwin on Patent-ability, pp. 18, 19, 22, 38; Beckendorf v. Faber, 92 U. S., 347. In a patentable device there must be invention, as distinguished from mechanical or technical skill. Invention is the creation of something new — new not as a mere modification of an idea already existing, but an addition to the stock of ideas. Merwin, p. 10.
In further considering the patentable novelty of claim 1 of the plaintiff’s patent, we enter the field of prior art of unpatented devices similar to the plaintiff’s alleged discovery.
It is shown by Finding II that the American Bank Note Co. in manufacturing pocket stamp books for the Western Union Telegraph Co. had knowledge of and had printed and used in booklet form the method of constructing multiple book leaf sheets of stamps, having unprinted cutting spaces and binding spaces, practically similar in all essential respects to plaintiff’s alleged discovery and allowed in his patent, as far back as 1883. It is apparent, therefore, that the narrow, unprinted spaces running through the body of the stamp sheet of defendants’ Exhibit E. A. No. 1 (Finding II) are for the purpose of perforation and also for cutting the sheets .into the small book sections of leaves of six stamps *44 each, the wider spaces running through the sheet being for the purpose of binding stubs for use in binding the leaves of six stamps each into booklets. It is likewise further shown that the Western Union Telegraph Co. sheets were also cut through between the long way of the sections and then, after collating the required quantity, were stitched together along with an interposed paraffin sheet between each sheet of stamps, and were subsequently split through crosswise of the section and placed in a case or cover.
By referring to the stamp sheet of the Western Union Telegraph Co., a replica of which is printed in Finding II, it appears that the spaces indicated by the “a’s” shown thereon are the perforated ones, while the spaces marked by “b” thereon are the cutting divisions. Also the spaces marked “ 1 ” would be for perforating and the spaces marked “2” are for cutting and separating the sheets of four stamps one from the other. The part used for a binding margin or stub is the margin at the head of the stamps marked “a.”
It further appears from the findings that if the permissible method of eliminating the wide central space in the stamp sheets of plaintiff’s claim 1 of his patent, as stated in the specifications therefor, may be done, we would reach an arrangement of stamp sheets under plaintiff’s method of “one series of narrow unprinted spaces in the body thereof, a second series of spaces wider than the first, along which said sheet is adapted to be stitched,” as compared with which claim the American Bank Note Co. shows that it manufactured a similar multiple stamp sheet booklet with one narrow unprinted space in the body thereof, a second series of spaces wider than the first as early as 1883, which is practically identical with claim 1 in plaintiff’s patent. It will be observed, therefore, by comparison that the stamp sheet manufactured by the American Bank Note Co. (Finding II) is identical, or practically so, with that of plaintiff’s when the wide, centrally located unprinted space is left out of his stamp sheet, as he says may be done if desired, and as he has done in the manufacture of his sheets as shown by the book covers in Finding IT.
The Patent Office examiners, after rejecting claim 1, stated that “only a claim to a specific construction can be *45 allowed,” whereupon plaintiff then inserted a claim for “a third series of spaces wider than the first and second series extending around the edges and centrally of said sheet.” It was upon this amendment or addition that plaintiff secured his patent, hut he states in his specifications that this central unprinted space is not an essential element in the construction of his stamp holders, and need not be used in a successful construction of the device.
A combination is an entirety and if one of its important elements is omitted the thing claimed disappears. Every part of the combination claimed is conclusively presumed to be material to the combination. A patentee makes all parts of a combination material when he claims them in combination and not separately. He can not, therefore, show his invention to be broader or narrower by construction to prevent anticipation. Walker on Patents, secs. 176, 181, 182, 186, 339, and 349; Case v. Brown, 2 Wall., 320; Derby v. Thompson, 146 U. S., 476, 482; Wright v. Yuengling, 155 U. S., 47; McClain v. Ortmayer, 141 U. S., 419, 425; Hubbell v. United States, 179 U. S., 77, 82; Water Meter Co. v. Vesper, 101 U. S., 332.
Plaintiff's claim 1 of his patent, therefore, necessarily fails for want of patentable novelty and utility by reason of like devices in the prior art.
Claim 2 of the patent reads as follows:
“A stamp sheet having unprinted spaces at intervals in the body thereof and a backing cover for said sheet adapted to be divided into sections to form books, substantially as described.”
The language of this claim is not definite. It was the evident intention of the patentee to form a combination of the stamp sheet as described in claim 1 of the patent, and, as plaintiff says, “a backing cover for said sheet adapted to be divided into sections to form books, substantially as described.” We are, therefore, necessarily referred by the terminal phrase of the claim, “substantially as described,” to the specifications and drawings of the patent for enlightenment thereon.
In figure 1 of the patent, as shown in Finding II, we find a sheet of multiple backing covers oi book backs. This sheet *46 of backing covers bas a series of divisional lines for the purpose of cutting the sheet in order to form small books and for stitching and for forming flaps for the same. Figure 3 is a view of the backing cover open with sheets of stamps interposed. Figure 4 is a backing cover opened, showing the two backs, stitched at e' and flap P1. Figure 5 shows the backing cover with flap closed.
Plaintiff says in his specifications, and as there is no definite description in claim 2 in his patent of the backing cover — we must look elsewhere for design — that "the flaps on the outside and on the inside of the cover F (figs. 3, 4, and 5 of his specifications) may be dispensed with, if desired.” This is a clear admission that the flap P' is not an essential element to the utility of the backing cover.
The elimination of the flap on the backing cover clearly brings the patent of J. Cussons, No. 414500, granted November 5, 1889, into this case, because of its similarity to plaintiff’s device, and it necessarily raises the question of the prior state of the art relating to patents covering this class of invention. See cuts in Finding II.
Cussons’s claims are:
“i. The method herein described of manufacturing blank books which consists in superimposing a series of unfolded sheets ruled to form the pages of a number of books, placing such unfolded sheets on a back of cover sheets, stitching through the sheets and cover along the folding line of the sheets and cover, then subdividing the whole and folding the subdivided sections along their stitched lines into complete books, substantially as described.
“2. The method herein described of manufacturing advertisement blank books, which consists in printing the advertisements in multiple impressions in rows upon a cover sheet, each row containing the impressions required for a series of 'complete books, superimposing a series of unfolded sheets, each having multiple impressions in rows one above the other, and each row containing the impressions required for a series of complete books, stitching through the superimposed unfolded sheets and cover along the folding line of the sheets and cover, subdividing the unfolded sheets and cover in two directions on lines extending at right angles to each other, substantially as described.”
Figure 3 of Cussons’s patent shows a sheet of multiple backing covers designed to form six complete small book *47 covers. Plaintiff shows a sheet containing a greater number of backing covers. The difference, therefore, between them is only one of degree. Cussons’s patent states that his sheet is to be divided by cutting along the divisional lines in two directions on lines extending at right angles to one another. Plaintiff subdivides his multiple backing sheet in the same manner. Cussons stitches his sheets and covers before subdividing, and then folds them to form his book. Plaintiff says nothing as to folding cover, which convinces us that he folds along the stitched line shown in figure 4 of his patent so that his single backing cover folded through the center of his book will form an upper and lower cover. Figure 5 of his patent shows clearly a book cover folded in the middle to make the upper and lower cover thereof.
If it should be necessary to further show that Cussons’s patent anticipated the plaintiff’s backing cover, the simple addition of a flap to the Cussons multiple sheet, Finding II, would reveal a true facsimile of plaintiff’s backing cover. As plaintiff admits that the flap on his backing cover is not a necessary element in the construction of his device, he thereby necessarily precludes its patentable novelty, because a backing cover was anticipated by Cussons’s prior art patent.
Claims 1 and 2 of plaintiff’s patent, therefore, necessarily fail for lack of patentable novelty and utility, and claims 3 and 4 of the patent, not being involved in this suit, have not been considered.
For the reasons given we decide (1) that there was no implied contract; (2) that the defendants did not use plaintiff’s invention for which he received a patent; and (3) that plaintiff, therefore, had no property right therein. Consequently the petition must be dismissed and judgment awarded for the United States, which is accordingly done.
It is ordered that the plaintiff’s motion for a new trial be, and the same is hereby, overruled.
The plaintiff’s motion to amend findings and the defendants’ motion to amend finding- are both allowed in part and overruled in part.
The former findings are withdrawn, and amended findings and opinion are this day filed. The judgment of the court to stand.